BERRY ASPHALT COMPANY *v.* KIDD.

4-6025 143 S. W. 2d 42

Opinion delivered July 8, 1940.

*McRae & Tompkins* and *S. Hubert Mayes*, for appellant.

*W. F. Denman* and *Tom W. Campbell*, for appellee.

SMITH, J. Appellee recovered a judgment for $11,000 to compensate a personal injury, and its reversal is prayed, upon this appeal therefrom, on three grounds: (a) that the testimony is insufficient to support the verdict; (b) that the court erred in giving, over appellants' objection, an instruction numbered 1; and (c) that the verdict is excessive.

The testimony may be summarized as follows: Appellee was 39 years of age at the time of his injury. He had at one time operated a blacksmith shop, in which an acetylene torch was used for welding purposes. He

did woodwork only, and was not a blacksmith, and "never worked with steel and iron, except what they fixed on the forge to put on wagons." He was employed by appellant, Berry Asphalt Company, in January, 1939, and he first "worked out in the field." On the day of his injury he was told to assist one Carpenter in the operation of a welding machine where flues were being welded to place in a boiler. He was told to hold the pipes in position which were being welded, and he held them at arms' length from the point of electrical contact. Carpenter "had an outfit to go over his face." Appellants had goggles, a pair of which appellee might have used, but nothing was said to him about using goggles. He did not know anything about the goggles or that he was supposed to use them. Appellee had never worked about an electric welding machine before, and did not know that his eyes would be burned if he did not use goggles.

Appellee worked all of one day and a part of the next. At the end of the first day his eyes were "bothering" him. The pain grew worse, and his eyes became swollen and red, and about nine o'clock that night he was carried to appellant's doctor who gave him treatment which afforded but little relief, and his wife made a potato poultice, which was placed over his eyes. About eight o'clock the next morning he went to see his own physician who had been called away on a case. He saw Dr. Gee the following day, and for three or four days later, when he went to see Dr. McDonald at Hope who treated him for about a month and until Dr. McDonald was killed in an automobile wreck.

He returned to the work of assisting the welder the day following and worked until about 10 a. m. He was then furnished and told to use a pair of goggles, and continued to use them while so employed during the remainder of his employment, a period of about four days.

It appears, from what has been said, that the theory upon which appellee sought compensation for his injury is that he was an inexperienced servant unaware of the danger of his employment, and that he was put in a dangerous employment without warning and without being supplied with goggles or other protection.

The testimony was to the effect that specially prepared goggles were usually furnished by the operators of electric welding machines to the employees assisting the welder; but appellee was unaware of that fact, and was ignorant of the danger incident to the employment about such machines without this protection.

It is insisted that appellee was aware of this danger, and would have been supplied with goggles had he asked for them. He admitted that an acetylene torch had been used in welding in his blacksmith shop, but, as has been said, appellee testified that he was not the user of the torch employed in his shop, which was a small torch.

J. T. Mendenhall, an instructor of a class in welding in the State A. & M. College at Monticello, testified that he was a welder by profession, and that it was a highly specialized trade, in which wages of from $1.10 to $1.25 per hour were paid. He explained the difference between acetylene torches and electric arcs used in welding. The acetylene torch threw off a bright light which was generated by great heat. It was not used for welding heavy stuff, while anything that can be welded may be welded with an arc or electric welder. The electric welder throws off ultra violet rays and infra red rays. These will burn the eyes, while the rays from the acetylene torch will not. He stated that electric welders were usually furnished a shield which covered the face, while the helper is usually furnished goggles having an arc-proof lens in them. The users of acetylene torches are required to use only colored lens. The witness further testified that a person who had never done any electric welding would not know what was hurting his eyes.

An eye specialist, testifying as an expert on behalf of appellant, was asked: "Q. Then the first exposure to that light would hurt the man and he couldn't look at it? A. It wouldn't cause what we call pain—the pain wouldn't come right away, all the electric opthalmia would be afterwards. Q. How long afterwards? A. From two or three to twelve hours."

We think this testimony presented the question whether appellee was an inexperienced servant, who had

been put to work in a dangerous employment without instruction or warning, and this issue was submitted to the jury in an instruction in which the law was stated to be that if appellee "knew and appreciated the risks and dangers incident to, working around the welding torches without goggles or shields for his eyes, then you are told no duty devolved upon Berry Asphalt Company, or Harry Miller (appellants), to warn him with reference to such dangers." Appellants had no right to ask a more favorable instruction upon this question.

We think the testimony also required the submission to the jury of the question whether the master was negligent in his duty to furnish appellee a reasonably safe place in which, and reasonably safe appliances with which, to work. This question was submitted to the jury in an instruction numbered 1 reading as follows:

"The jury is instructed that it is the duty of the master to furnish to the servant a reasonably safe place in which to work and reasonably safe appliances with which to work. Therefore, you are instructed that if you find from a preponderance of the evidence in this case that in January, 1939, the plaintiff, R. L. Kidd, Jr., was in the employ of the defendant, Berry Asphalt Company, at its place in Nevada county, Arkansas, as charged in his complaint; and you further find from a preponderance of the evidence that Harry Miller was in the employ of the Berry Asphalt Company, whose duty it was to direct this plaintiff about his work, and you further find from a preponderance of the evidence in this case, that the defendants, Berry Asphalt Company and Harry Miller, ordered and directed the plaintiff, R. L. Kidd, Jr., to assist other employees of the defendant, Berry Asphalt Company, in doing certain welding with an electric torch; and you further find from a preponderance of the evidence in this case that in working. around and about an electric welding torch without the use of goggles or other protection to the eyes is dangerous and hazardous, and that they, the defendants, and each of them knew or by the exercise of due and ordinary care could and should have known same; if you in fact find from a preponderance of the evidence in

this case same was hazardous and dangerous and that the plaintiff, because of his inexperience in this particular line of work, did not know of and appreciate the dangers and hazards, if any; and you further find from a preponderance of the evidence that the defendants carelessly and negligently failed, refused or neglected to warn and instruct the plaintiff as to said dangers and hazards, if any; and you further find from a preponderance of the evidence that said defendant, Berry Asphalt Company, carelessly and negligently failed, refused or neglected to furnish to this plaintiff goggles or other protection for his eyes, and by reason of such failure, if any, the plaintiff was injured as charged in his complaint; and that he himself was not guilty of contributory negligence and had not assumed the risk, the plaintiff would be entitled to recover herein against both defendants.''

The record reflects the fact that certain objections were made to the instructions as they were being passed upon by the court, and the judge stated: ''If you have any other exceptions to the plaintiff's instructions, you may make them to the court reporter later.''

We do not think appellant had the right to interpret this remark as meaning that specific objections might be made the next day or at some time later after the trial was over. The very purpose of making specific objections would be defeated if the court's attention was not called to the alleged error before the trial was ended.

The specific objections later made were not called to the attention of the court until the question of approving the bill of exceptions arose. The specific objections were that the question of a safe place in which to work was not involved, and that the instruction makes the master the insurer of the safety of the appliances furnished the servant, whereas the law is that the master is only required to use ordinary care to furnish reasonably safe tools and appliances.

The master does not insure the servant's safety, and has discharged his duty when he has used ordinary care to furnish the servant a reasonably safe place in which

to work and reasonably safe appliances with which to work, while the servant himself exercises ordinary care for his own safety. We do not think the instruction declares the law to the contrary. Scores of cases from many states are cited in the brief of appellee in which the master's duty has been declared in substantially the same language employed in the instruction. Among many cases is our own case of *Pettus & Buford* v. *Kerr*, 87 Ark. 396, 112 S. W. 886, in which the trial court charged the jury that it was the duty of the master to furnish the servant with suitable machinery, tools and appliances with which to work, and that the servant had the right to presume that the master had discharged his duty in these respects. The objection to the instruction was that it declared it to be the duty of the master to furnish a safe place to the servant, instead of a reasonably safe place. It was held that no error was committed, for the reason that no specific objection was made, and that the error would have been cured by charging the jury that it was the master's duty to furnish a reasonably safe place, which the court presumably would have done had that request been made.

Here, the instruction conforms to what was there said to have been a correct statement of the law. The instruction No. 1 did not require the master to furnish safe appliances, thereby becoming an insurer of the servant, but only required ''the master to furnish to the servant a reasonably safe place in which to work and reasonably safe appliances with which to work.''

Here, the testimony supported the finding that the place in which the servant was required to perform his duties was rendered unsafe because the servant had not been furnished goggles or other protection which would have made his work reasonably safe.

Appellant cites cases like *Spadra Coal Co.* v. *White*, 188 Ark. 568, 66 S. W. 2d 1072, upholding and quoting from the opinion of this court in the case of *Fort Smith-Spadra Mining Co.* v. *Shirley*, 178 Ark. 1007, 13 S. W. 2d 14, in which judgments were reversed because the instructions imposed upon the master the duty of fur-

nishing the servant a safe place in which, and safe appliances with which, to work, thereby making the master an insurer, instead of requiring only that he exercise ordinary care in those respects.

In our opinion, instruction numbered 1, above quoted, is not open to this objection, especially so in the absence of a specific objection.

Cases from many jurisdictions are cited in appellee's brief in which this duty has been variously expressed, some opinions saying that it is the duty of the master to exercise ordinary care, and reasonable care to furnish the servant a safe place in which to work and safe appliances with which to work, while others state the duty of the master to be to furnish the servant a reasonably safe place in which to work and reasonably safe appliances with which to work, and there appears to be no difference in the legal significance between these two ways of expressing the master's duty. Neither statement imposes on the master the duty to furnish a safe place and safe appliances, but each requires only that the master exercise ordinary care in respect to the safety of such place and appliances.

It is earnestly insisted that, in any event, the undisputed testimony shows that the verdict is excessive and is not supported by the testimony.

It appears that appellee's eyes were examined and tested by appellant's physician when appellee was first employed, and this doctor testified that appellee's vision was then 20-30, when normal vision was 20-20. It was explained by the witness testifying as an expert on behalf of appellant that this means that a man with a vision of 20-30 can only distinguish an object at 20 feet which he should be able to distinguish at 30 feet, and indicates that the vision is 89 per cent. normal. This expert testified that appellee's present vision tested 20-40, which meant that he was able to distinguish at 20 feet an object which he should distinguish at 40 feet, and that his vision was 82 per cent. of normal. The testimony of this witness shows an impairment of 7 per cent. of vision as a result of appellee's injury. All the

witnesses agree that the impairment—whatever it may be—is of a permanent character.

Another expert, testifying on behalf of appellee, stated that appellee had sustained a loss of 60 per cent. of his vision, and that on a dark day his vision was only 40 per cent. normal.

Appellee testified that he had suffered great pain, and still suffers, especially when he attempts to work in the sunlight or without an eye shade; that he is now unable to read, and when he attempts to do so the letters run into black lines; that at the time of his injury he was earning $4.80 per day, and that he has since earned only half that amount, when he found employment which he could follow.

Under this testimony, we are unable to say that the verdict is excessive, and as no error appears the judgment must be affirmed, and it is so ordered.